UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                  Case No. 06-20290

v.                                  Hon. Lawrence P. Zatkoff

LASHAWN WILSON,

     Defendant.

_____/

## OPINION

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on August 24, 2011

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

At a re-sentencing hearing held on August 11, 2011, the Court sentenced Defendant Lashawn Wilson ("Defendant"). The re-sentencing of Defendant stemmed from the Sixth Circuit Court of Appeal's conclusion that the sentence imposed on Defendant by this Court on July 24, 2008, was procedurally unreasonable. As described below, in a July 19, 2010, opinion in *United States v. Wilson*, 614 F.3d 219 (6th Cir. 2010), the Sixth Circuit panel assigned to the case vacated Defendant's sentence and remanded the matter to this Court for re-sentencing. At the re-sentencing hearing, the Court sentenced Defendant to time served (according to Defendant's counsel, she has "served" 45 months); no restitution, fine or supervised release was ordered.

The Court now writes to address two issues raised by this case: (1) the required lag time in the federal system between the date a Defendant is convicted (pursuant to a plea or following a trial) and the date of sentencing; and (2) the opinions authored by the Sixth Circuit panel in this case, especially as such opinions relate to "pre-prepared" written sentencing opinions. The Court notes that neither of these factors - and the Court's view on them - had any bearing on the sentence imposed on Defendant today.

## II.  BACKGROUND

**A.      Relevant History up to and including the July 24, 2008, Sentencing**

The Court's July 24, 2008, written sentencing opinion detailed the factual background of the events that led to Defendant being charged with committing mail fraud, as well as the events and proceedings leading up to Defendant's sentencing on July 24, 2008. Although the Court shall reiterate that factual background below (as modified to reflect that Defendant did not personally steal money orders from the bank and was not privy to the entirety of the money orders that were stolen from the bank), the Court concludes that, in order to appropriately address the issues raised by the Sixth Circuit in its opinion, further scrutiny of the events preceding the Court's July 24, 2008, sentence is necessary.

On May 26, 2006, the Government filed an information charging Defendant with one count of violating 18 U.S.C. § 134 - Mail Fraud. The information alleged that Defendant had violated that statute by defrauding a financial institution when she placed stolen money orders in the United States Mail. In its July 24, 2008, written sentencing opinion, the Court recited the factual underpinnings of the crime as follows:

On December 31, 2002, the Assistant Vice President of Fifth Third Bank in Southfield, Michigan, contacted agents from the United States Postal Inspector Service (USPIS) regarding the theft of 1000 blank money orders and 500 blank cashier's checks. As of that date, 163 of the stolen money orders and 11 of the stolen cashier's checks had been fraudulently negotiated.

On January 6, 2003, a fraud investigator for Apple Computers also contacted the USPIS and reported that an individual, later identified as Defendant, had placed eight separate orders for Apple computers and mailed thirty-five of the stolen money orders as payment. Although the [Apple] computers were ordered using eight different names, all [eight of the Apple computers] were to be delivered to 1727 Elsmere St., Apt. 2, in Detroit. Furthermore, one of the orders contained the email address of wlashawn@aol.com. Defendant's name also appeared on eleven of the money orders in the "purchased by" section and on two of the money orders as the "payee."

On January 9, 2003, following the delivery of an Apple computer shipped in the name of Tristian Allen, federal agents executed a search warrant at the Elsmere address in Detroit. Defendant was present during the search. Defendant initially identified herself as Tristian Allen but later admitted her true identity. Defendant admitted to the agents that she ordered computers under different names from Dell, Compaq, IBM, and Apple by mailing the stolen money orders as payment and having the [Dell, Compaq, IBM, and Apple] computers shipped to various addresses in Detroit. During the search, agents recovered original money orders and carbon copies of original money orders payable to Apple Computer Company that used various names, including Tristian Allen. The search further produced a customer invoice from Gateway Computer Company addressed to Tristian Allen at one of the addresses Defendant used to receive the computers. Agents also discovered various personal identification information of five individuals, including social security numbers, dates of birth, and driver's license numbers.

In sum[,] Defendant admitted to using thirty-six stolen money orders totaling $32,116.40 to purchase eight computers, which were shipped to her home address. Furthermore, the search produced eight additional money orders totaling $2[,]563.41, which were completed and ready to be mailed. In total, the money orders amounted to $34,697.81 in losses. Following the search, the agents arrested Defendant and took her into custody.

3

Defendant was ordered to appear on August 1, 2006, for a plea hearing. The Assistant United States Attorney ("AUSA") originally assigned to this case, Leonid Feller ("AUSA Feller"), contacted the Court on July 24, 2006. AUSA Feller stated that Defendant had absconded from a halfway house on a state court sentence and her attorney was unable to contact her. Needless to say, Defendant did not appear for the August 1, 2006, plea hearing. A first superceding indictment was issued on September 12, 2006, along with an arrest warrant.

Defendant had no further contact with the federal court system until she was arrested while meeting with her state probation officer. Defendant appeared before Magistrate Judge Pepe for her initial appearance on January 25, 2008. Despite Defendant's non-appearance at the August 1, 2006, plea hearing, her subsequent 17-month disappearance, and the fact that she was in court only because the September 12, 2006, arrest warrant had been executed, the Government[1] did not request that Defendant be held in custody, and Magistrate Judge Pepe inexplicably released Defendant on a $10,000 unsecured bond.

Defendant was to be arraigned on the first superceding indictment three days later (on January 28, 2008) before Magistrate Judge Scheer. The pre-trial officer assigned to Defendant, Tom Nugent, traveled to Defendant's listed address to remind her of the hearing, even though such action was atypical. Despite Mr. Nugent's efforts, however, Defendant was not home. Mr. Nugent later spoke with Defendant via telephone on the date of the scheduled arraignment, at or near the time set for her arraignment. Defendant stated that she did not have transportation to the court and would be taking the bus. Not long thereafter, Defendant informed Mr. Nugent

---

[1]AUSA Feller did not attend the January 25, 2008, hearing, and the AUSA attending the hearing did not have the case file or, apparently, any awareness of Defendant's history, including the fact that she had absconded in July 2006.

4

that she was at the Motor City Casino, a casino which is several blocks from the federal courthouse in Detroit where she was to appear for the arraignment. Defendant told Mr. Nugent that she would walk to the courthouse from that location. Defendant, however, never appeared for the arraignment on January 28, 2008. The next day, Mr. Nugent spoke with Defendant again. Although Defendant said she would appear before a magistrate later that day, she did not appear for her arraignment on January 29, 2008, either.

A second arrest warrant was issued by the Court on January 30, 2008. After Defendant was taken into custody by Wayne County, Michigan, authorities on an unrelated matter, the Government obtained an Order with Petition for Writ of Habeas Corpus and Prosequendum against Defendant on March 18, 2008. On March 21, 2008, Defendant finally was arraigned on the first superceding indictment filed 18 months earlier (on September 12, 2006).

On May 13, 2008, Defendant, without the benefit of a Rule 11 plea agreement, entered a plea of guilty to Count I of the first superceding indictment. Because there was no Rule 11 plea agreement, AUSA Feller provided the Court with a letter detailing the factual basis for the plea and the nature of the charges.[2] The letter contained the following allegation: "Between approximately September 16, 2002 and December 27, 2002, the defendant obtained stolen Fifth Third bank money orders, which were taken by an individual identified as Larry Malone"

---

[2]AUSA Feller did not file the letter, dated May 7, 2008, on the docket at the time he supplied it to the Court, nor has the letter been filed on the docket since that time.

("Malone").[3]  Based on this allegation, the following exchange took place during the plea colloquy:

> The Court: And where were you physically?  In what city?
>
> The Defendant: Detroit, Michigan.
>
> The Court: City of Detroit.  And you received some money orders that were taken by somebody from a bank?
>
> The Defendant: Yes.
>
> The Court: That was Mr. Malone?
>
> The Defendant: Yes.

Plea Hr'g Tr. at 13.

At the May 13, 2008, plea hearing, the Court announced that Defendant's sentencing hearing would take place on July 24, 2008.  Probation officer Wyndi Surdu ("Ms. Surdu") prepared a Presentence Investigative Report ("PSR") on Defendant, initially dated June 9, 2008, but subsequently revised on July 9, 2008.  As the Court's July 24, 2008, written sentencing opinion indicated, neither the Government nor Defendant filed objections to the PSR, nor did either party file a sentencing memorandum.  Defendant did, however, file a four-page handwritten letter on her own behalf, which the Court reviewed and considered.  Notably, Malone's involvement was not mentioned anywhere in the PSR, and no party objected to that omission.[4]  The PSR indicated only that the money orders were stolen and that Defendant had been using stolen money orders as payment for computers.

---

[3]Neither the information nor the first superceding indictment mentioned who had stolen the money orders, and the theft of the money orders had nothing to do with the sole charge against Defendant - a charge for mail fraud.  More significantly, the theft of the money orders had absolutely nothing to do with the sentence the Court imposed on Defendant.

[4]The most recent revised version of the PSR, prepared on December 16, 2010, *i.e.*, subsequent to the Sixth Circuit's ruling, also does not mention that Malone stole the money orders.  Once again, no party objected to or commented on that omission.

Prior to the sentencing hearing, the Court reviewed all of the submitted materials and drafted a thorough, written sentencing opinion, as it had on numerous occasions prior to the instant case, unaware that doing might be considered improper, at least by some judges. The written sentencing opinion prepared by the Court set forth, in great detail, the procedural background of the case, Defendant's criminal history, the applicable advisory Sentencing Guidelines range, and a full and complete analysis of the sentencing factors enunciated at 18 U.S.C. § 3553(a).

At the sentencing hearing itself, the Court, per its standard procedure and in the following chronological order: (1) permitted Defendant's attorney to present oral argument and speak on behalf of Defendant, (2) afforded Defendant the opportunity to exercise her right to allocute (which she exercised), and (3) afforded the Government the opportunity to place its argument on the record. After the counsel for the Government concluded her statement,[5] the Court proceeded to announce the sentence it was imposing on Defendant:

> THE COURT: Let the record reflect that I have had an opportunity to review the file and review the pre-sentence report. I have reviewed the letter sent to the Court by [D]efendant, and I have reviewed the Complaint and Indictment, reviewed the guidelines and the [3553] factors.
>
> I understand the guidelines – advisory guidelines range is 24 to 30 months. And the Court finds that is inadequate for a sentence in this case.
>
> It's going to be the sentence of the Court that the [D]efendant be turned over to the Bureau of Prisons to be confined for a period of 48 months. She is to undergo the drug treatment program while she is in prison, and that is to be followed by two years supervised release and the standard conditions as adopted by the Eastern District of Michigan.

---

[5]AUSA Feller was not present for the sentencing hearing. In his stead, AUSA Susan Gillooly ("AUSA Gillooly") appeared on behalf of the Government. The Court is not aware whether AUSA Gillooly had any familiarity with the case at that time, as she had not previously appeared on the case.

A special condition would be that she undergo drug and/or alcohol testing and treatment at the direction and discretion of the United States Probation Department. I'm imposing a $100 special assessment pursuant to the statute.

I have prepared an Opinion and Order listing my reasons for the imposition of this particular sentence. ***I need to modify that Opinion and Order slightly*** and it would take probably five minutes.

Rather than read this Opinion and Order into the record, what we are going to do is we're going to take a recess and ***I'll make the modifications***. I am going to hand out a copy of this Order to both counsel and we will reconvene in whatever time it takes for you to review the Order so that you may bring to my attention any objections that you have for the reasons set forth in the Order.

* * * * *

We will take a recess. We will have in your hand an Opinion and Order in less than five minutes. And then after counsel has had an opportunity to review it we will reconvene and address any objections or any other matters they may have with respect to my reasoning for imposing the sentence.

The Court then, in the following order: (1) recessed the sentencing hearing, (2) based on what Defendant's attorney, Defendant and counsel for the Government had said during the sentencing hearing to that point, made modifications to and completed certain portions of the written sentencing opinion it had drafted, (3) gave copies of the completed written sentencing opinion to the parties, and (4) provided the parties as much time as they desired to review the opinion before going back on the record.[6]

The hearing reconvened after both parties informed the Court's staff that they had reviewed the written sentencing opinion and did not need any more time to review it. Once the Court went back on the record, the Court inquired whether either party had any objections to the written sentencing opinion they had been given to review. There were no objections to the

---

[6]Both the lead and concurring appellate opinions agree that the parties had ample time to review the Court's proposed written sentencing opinion. *See Wilson*, 614 F.3d at 222 n.2; *id*. at 227.

8

Court's findings contained in the written sentencing opinion (*e.g.*, that Malone, not Defendant, stole the money orders), but Defendant's counsel objected on various grounds to the substance of the Court's sentence of 48 months imprisonment because it exceeded the top of the advisory Guidelines range. The Court overruled those objections and reiterated that Defendant's sentence was 48 months.

**B.     The Appeal and Sixth Circuit Ruling**

Defendant exercised her right to appeal her sentence. She argued that the sentence imposed by the Court was both procedurally and substantively unreasonable. On July 19, 2010, the Sixth Circuit released its decision reversing the sentence imposed by the Court. The Sixth Circuit agreed with Defendant's argument that the sentence was procedurally unreasonable because the Court relied on two erroneous facts when sentencing Defendant. According to Defendant, the Court's written sentencing opinion reflected that the Court: (a) concluded that Defendant, rather than Malone, stole the money orders, and (b) insinuated Defendant possessed all of the stolen orders, when in fact she only possessed some of them. Although Defendant did not object to these portions of the written sentencing opinion at the sentencing hearing on July 24, 2008, the Sixth Circuit found that this was plain, and therefore reversible, error. The Sixth Circuit did not address Defendant's substantive arguments.

In a footnote, the lead opinion noted that the use of a "pre-prepared" written sentencing opinion was "somewhat disconcerting," even though Defendant did not object to that practice at the sentencing hearing or on appeal. *Id*. at 222 n.1. The concurring opinion offered more than an isolated comment regarding the Court's practice of circulating a written sentencing opinion for the parties' review: (1) after hearing from the parties and announcing a sentence, but (2) before asking the parties if there were any objections to the sentence imposed. The concurring

9

opinion stated that the Court's conduct "deserves the kind of piling on that cannot be accomplished in a footnote" and then proceeded to express its disdain for the Court's practice. *Id*. at 226.

### C.    Defendant's Post-Sentence Conduct

Two months before the Sixth Circuit vacated her sentence, Defendant's custodial status with the Bureau of Prisons ("BOP") shifted from incarceration in prison to placement at a residential re-entry center ("RRC").  As set forth in the revised PSR prepared by Ms. Surdu and dated December 16, 2010 (the "Revised PSR"), Defendant engaged in the following conduct subsequent to July 24, 2008, when she commenced serving the 48-month sentence imposed by the Court that day:

21.    WILSON began serving her original sentence of 48 months custody, credit 108 days, on July 24, 2008.  WILSON's Projected Release Date was originally scheduled for October 1, 2011.  While in custody, WILSON completed the 500 hour Residential Drug Abuse Program, commonly referred to as RDAP.  According to the Bureau of Prisons, "Inmates may receive a period of early release, not to exceed 12 months, based on the length of sentence imposed by the Court."  As a requirement for the RDAP, inmates must also serve 180 consecutive days in a Residential Reentry Center (RRC).  After successfully completing the 500 hour RDAP, WILSON's new release date was determined to be October 17, 2010.  Pursuant to 18 U.S.C. 3621(e), Early Release Procedures.

22.    From July 24, 2008 until May 1, 2010 (the day WILSON arrived at the RRC) totaled 1,011 days, in addition to the 108 days jail credit totals 1,119 days (approximately 37.3 months).  Wilson served 84 of her required 180 day placement in the RRC.  Leaving a balance of 96 days, which would have put her release date at approximately October 17, 2010. Because WILSON completed of [sic] the 500 hour RDAP, WILSON would have received approximately one year off her sentence.

10

23.     Upon WILSON's arrival to the Residential Reentry Center (RRC) on May 1, 2010, WILSON tested positive for alcohol. Her blood alcohol level was .026 (BAC). WILSON contended that she drank a bottle of Nyquil. WILSON attended the Personalized Light House on May 11, 2010, located at 3800 Woodward, Detroit, Michigan, due to being diagnosed with Bi-polar, anxiety, depression, and Obsessive Compulsive Disorder. She was placed on Wellbutrin and Zoloft. After being given a weekend pass, WILSON tested positive for barbiturates [on July 5, 2010]. However, the urine sample leaked while in transport to the lab and therefore could not be used or tested. According to the lab, the odor of the specimen smelled as though it had been adulterated. Typically, WILSON would have been remanded back to the Bureau of Prisons immediately. WILSON then escaped from the RRC on July 19, 2010, while on a pass. . . .[7]

Revised PSR, at 6-7. Thus, somewhat ironically, on the same date the Sixth Circuit vacated Defendant's sentence and remanded her case to this Court for re-sentencing, Defendant failed to return to the RRC. In other words, on July 19, 2010, Defendant escaped from the custody of the BOP.

On or about January 27, 2011, Defendant was apprehended on a charge of receiving and concealing stolen property.

**D.     Procedural History of the Case Since Mandate was Issued by the Court of Appeals**

On August 11, 2010, the Sixth Circuit issued its mandate remanding the case to this Court for re-sentencing. Initially, the Court waited to set Defendant's re-sentencing hearing to see if she would be apprehended. When Defendant remained at large for many months, the Court determined that Sixth Circuit precedent is clear that the Court could sentence Defendant if she was not present because she had voluntarily absented herself from the sentencing hearing.

---

[7]The fact that Defendant had been granted a second weekend pass exceeds the bounds of reason because she tested positive for barbiturates only two weeks earlier, on the occasion of her return to the RRC after being granted her first weekend pass. As Ms. Surdu noted, a defendant who tests positive while at an RRC typically is remanded back, immediately, to the BOP for incarceration. Perhaps, as the Government has suggested, Defendant was aware of this possibility and was motivated to escape from the RRC when granted a second pass.

11

*See, e.g.*, *United States v. Robinson*, 390 F.3d 853, 886-87 (6th Cir. 2004); *United States v. Watkins*, 86 Fed.Appx. 934, 936-37, 2004 WL 237412, at **2-3 (6th Cir. 2004). *See also* Fed.R.Crim.P. 43(c)(1)(B) (a defendant who "pleaded guilty . . . waives the right to be present . . . in a noncapital case, when the defendant is voluntarily absent during sentencing"). Therefore, on December 15, 2010, approximately five months after Defendant escaped, the Court filed on ECF a Notice to Appear for the re-sentencing hearing at 11:00 a.m., February 15, 2011. Prior to the Court sending out the notice of the re-sentencing, no one contacted the Court to: (a) inquire about scheduling a date for the re-sentencing of Defendant, (b) ask whether the Court would accept a sentencing memorandum before the re-sentencing, or (c) notify the Court that Defendant had escaped from BOP custody.[8]

On January 28, 2011, the Court was contacted by AUSA Feller. AUSA Feller informed the Court that Defendant had been apprehended the previous evening for receiving and concealing stolen property and was being detained in the custody of the State of Michigan. Later that day, Defendant was turned over to federal custody. On January 31, 2011, the Court received a sentencing memorandum from AUSA Feller. On the same day, the attorney who had been appointed to represent Defendant on appeal and was still the attorney of record for purposes of her re-sentencing, John Minock ("Mr. Minock"), requested an adjournment of the re-sentencing because he represented that he had not and would not have an opportunity to communicate with Defendant prior to the February 15, 2011, re-sentencing date. In order to accommodate Mr. Minock and continue to ensure that Defendant be afforded adequate representation, on February

---

[8]Even after the Court filed the Notice to Appear for the re-sentencing hearing, the Court still was not contacted by any person or agency involved with the federal criminal justice system regarding Defendant's escape, or for any other reason with respect to Defendant's case, until January 21, 2011, when Mr. Minock contacted the Court to inquire why the Court was conducting the sentencing hearing when Defendant was "at large."

12

1, 2011, the Court adjourned the re-sentencing for 30 days, until March 15, 2011. On March 13, 2011, Mr. Minock filed a sentencing memorandum on behalf of Defendant.

After concluding that Mr. Minock: (1) did not utilize the 30-day adjournment wisely (specifically, by filing an untimely sentencing memorandum on Defendant's behalf), (2) essentially asked the Court to allow him to withdraw from representing Defendant, and (3) otherwise exhibited a level of advocacy on behalf of Defendant that caused the Court concern that Defendant was receiving adequate and competent representation (as demonstrated by his responses to two Orders to Show Cause issued by the Court in March 2011), the Court adjourned the March 15, 2011, sentencing hearing. Ultimately, the Court terminated Mr. Minock from representation of Defendant on May 2, 2011. On the same day, the Court ordered that new counsel be appointed for Defendant and days later the Court was notified that Martin Beres ("Mr. Beres") would be representing Defendant. On May 4, 2011, Ross MacKenzie ("AUSA McKenzie") replaced AUSA Feller on the case. On August 5, 2011, Craig Weir ("AUSA Weir") replaced AUSA McKenzie on the case.

On May 9, 2011, after consulting Mr. Beres to ensure that he would have adequate time to become familiar with Defendant's case and competently represent her at sentencing, the Court scheduled Defendant's sentencing hearing for today, July 12, 2011. On June 29, 2011, at the request of Defendant, the Court again adjourned her re-sentencing hearing, this time setting the hearing date for August 11, 2011. On August 2, 2011, Mr. Beres filed a second sentencing memorandum on behalf of Defendant. The Court notes that the Government did not file a second sentencing memorandum, nor did it file a response to the sentencing memorandum filed by Mr. Beres. At the re-sentencing hearing, Defendant was present, as was her attorney, Mr. Beres, and the current AUSA on the case, AUSA Weir. In determining the sentence imposed on Defendant

13

today, the Court reviewed and considered: (a) all arguments in both the sentencing memoranda filed on behalf of Defendant, as well as the responses to the Orders to Show Cause filed by Mr. Minock, (b) the sentencing memorandum of the Government, (c) the arguments of Mr. Beres, (d) the allocution by Defendant, and (e) the arguments of AUSA Weir.  No written sentencing opinion was - or shall be - issued.  As noted above, on August 11, 2011, the Court sentenced Defendant to time served.

## III.  DISCUSSION

The Sixth Circuit vacated Defendant's sentence because this Court misstated a fact (and, apparently, insinuated another "fact" that was not accurate) in its July 24, 2008, written sentencing opinion.  While the Court concedes that its factual recitation contained an error – an error that was immaterial and wholly irrelevant to the sentence pronounced – the circumstances of this case are such that the Court feels compelled to comment on: (1) the broader structural flaws that instigate such errors when sentencing a federal defendant, and (2) certain of the comments made by the Sixth Circuit panel in issuing their opinions.

**A.      Sentencing Time Line**

The Court received AUSA Feller's letter detailing the factual basis for the plea on May 7, 2008.  This was the first time that the Court was made aware of Malone's involvement in this matter. The plea hearing took place six days later, on May 13, 2008, and that was the last time Malone's involvement in this matter was ever mentioned by anyone.

The PSR did not refer to Malone by name, nor did it state that someone other than Defendant was responsible for the theft of the money orders.  Neither party filed objections to the PSR or a sentencing memorandum.  Neither party mentioned Malone at the sentencing hearing.  And, most significantly, neither party raised any objection to the written sentencing

14

opinion the Court circulated to the parties at the sentencing hearing, an opinion that, in error, indicated that Defendant stole the money orders.  The Court makes no excuses for this error, and it will strive to ensure this does not occur again in the future.  The current situation, however, provides the occasion to comment upon the procedures of our sentencing system to which such errors may be attributed.

Our criminal justice system is predicated upon the swift and sure determination of guilt or innocence.  To this end, Congress passed the Speedy Trial Act, s*ee* 18 U.S.C. §§ 3161-3174, which mandates that an adjudication of guilt or innocence be determined in a timely manner.  More specifically, the Speedy Trial Act provides that an accused has the right to a trial within 70 days of the accused's first appearance, which is entirely consistent with the ideals of swift and efficient justice that underlie our criminal justice system. The 70-day requirement necessarily accelerates the parties' discovery efforts and constrains the trial court's calendar, but Congress has determined that an accused's right to a timely adjudication of his or her guilt or innocence trumps such concerns.  While a court may order certain statutorily-delineated periods of time as excludable delay pursuant to the Speedy Trial Act, the Sixth Circuit has closely scrutinized such delays and scrupulously applied the Speedy Trial Act's 70-day prescription.  *See, e.g.*, *United States v. Tinklenberg*, 579 F.3d 589 (6th Cir. 2009).  Such haste ends there, however, and the hare becomes the tortoise.

After a defendant's conviction, the foregoing Speedy Trial Act ideals are totally discarded, leaving both the public and the defendant in limbo.[9]  The time period required

---

[9]The Federal Rules of Criminal Procedure provide only that "[t]he court must impose sentence without unnecessary delay."  Fed.R.Crim.P. 32(b)(1).  The remainder of those Rules, along with the requirements imposed by federal statutes and binding precedent, however, render that vague statement illusory.

between a determination of guilt and the sentence for the offender is generally greater than the 70-day time period allowed to adjudicate the matter. The applicable Sentencing Guidelines range must be calculated, even though the Guidelines range is merely advisory and the Court is not required to sentence the defendant within that Guidelines range. *See United States v. Booker*, 543 U.S. 220, 265 (2005) (Breyer, J., opinion) (finding unconstitutional the mandatory provisions of the federal Sentencing Guidelines). A PSR must be prepared and submitted to the Court and the parties, and the parties are thereafter allowed to file objections. *See* Fed.R.Crim.P. 32. Sentencing memoranda also may be filed by Defendant and/or the Government.

Conformance with the above procedures requires a great deal of time. In this case, 72 days elapsed between Defendant's guilty plea and her sentencing hearing. Thus, the time period between Defendant's plea and her sentence was longer than the time period within which an accused is entitled to a trial following the initiation of a criminal matter. Moreover, in the years since Defendant was sentenced, the Eastern District of Michigan adopted (and now requires) an even longer period of time between a defendant's conviction and his or her sentencing. The "Speedy Trial Act Plan," approved by the Judges of the Eastern District of Michigan and the Judicial Council of the Sixth Circuit, then signed by the Chief Judge of the Sixth Circuit and entered as E.D. Mich. Administrative Order 10-AO-003 (January 14, 2010), provides, in relevant part:

      **9.**    **Time Within Which Defendant Should be Sentenced**

      **(a)**    **Time Limit.** A defendant shall ordinarily be scheduled for sentence not less than 90 days after the date of conviction by verdict, plea of guilty or *nolo contendere*.

      **(b)**    **Related Procedures.** If the defendant and counsel consent thereto, a presentence investigation may be commenced prior to a plea of guilty or *nolo contendere* or a conviction.

16

This delay between conviction and sentencing is incompatible with Congress's intention in enacting the Speedy Trial Act and with the cornerstones of our criminal justice system. As stated above, our system depends on the swift and sure administration of justice. This ideal includes certainty of appropriate punishment for a proven violation of law. This rings especially true in our federal system, where approximately 95% of criminal filings result in a plea of guilty, and about 90% of those cases that go to trial result in conviction. That is, in recognition of its limited resources, the Government pursues those cases that it considers the most meritorious, and it is indisputably successful in doing so. When one considers the Government's high level of success in federal criminal prosecutions, the public's (and the accused's) perception of the federal criminal justice system becomes dependent on the sentence imposed. Does the accused receive a "slap on the wrist," or does the sentencing court impose a substantial sentence?

In the federal system today, however, the sentence almost appears to be an afterthought, occurring long after the certainty of a plea agreement or a conviction at trial. As such, the public is kept waiting for months following a finding of guilt - nearly a quarter of a year in this case. In fact, such delay gives the appearance that the sentencing is completely independent from the principal case. A reduced gap between the determination of guilt and sentencing would increase the public's confidence in our system, as there would be an ascertainable correlation between guilt and punishment.

Just as significantly, the rights of the defendant would also be served by a much quicker period between conviction and sentence as the defendant would know, rather than have to (at times) endlessly wonder, what the terms of his or her punishment will be. The Court cannot fathom how a criminal defendant's right to a prompt determination of the punishment for his or her crime(s) can be considered less compelling than a defendant's right to timely adjudicate his

17

or her guilt but, apparently, it is.  Significantly, this was not always the case, nor does it need to be.

Other judicial systems demonstrate that an appropriate sentence can be determined in a timely and efficient manner.  In the undersigned's experience as a Macomb County (Michigan) Circuit Judge, criminal defendants often received their sentence within two weeks after their guilty plea or conviction by jury.  That time line remains true in Macomb County today.  Likewise, in the Oakland County (Michigan) Circuit Court, a judge is required to sentence a defendant promptly after a conviction; the sentence is to be within two weeks after a conviction at trial and within five weeks after conviction by a guilty plea.  Significantly, the sentencing determination in these courts includes all of the factors considered at the federal level (*i.e.*, a presentence report, sentencing memoranda, etc.).  A cursory review of the criminal system in the State of Michigan reveals that many other courts adhere to a sentencing time line similar to those used in Macomb and Oakland County. *See, e.g., People v. Dabish* (Wayne County (Michigan) Circuit Court, November 18, 2010) (defendant sentenced to life in prison without parole 17 days after jury convicted him of first-degree murder); *People v. Arango*, No. 287323, 2009 WL 3199541 (Mich.App., Oct. 9, 2009) (Wayne County (Michigan) Circuit Court judge's decision to schedule sentencing hearing 50 days following the plea date was challenged as not being scheduled within reasonable time after the plea, as required by Michigan Court Rules).  In other words, it is possible to impose a sentence on a far more timely basis than is being done in the federal system today.

One only has to look at the federal system from a historical perspective to see that how unnecessary it is to have the excessive delays associated with sentencings today.  For example, in 1965, the Sixth Circuit heard a challenge attacking a sentence as void under the Sixth

18

Amendment because "Defendant was not sentenced *at the times the pleas were entered*." *See Welsh v. United States*, 348 F.2d 885 (6th Cir. 1965) (emphasis added).  While the appellant was not successful, the fact that such a challenge was attempted shows how much our system has changed in the past 45 years.

Even more poignant is a look at the time line for the sentencings (and executions) of the two men convicted of assassinating a President.  Leon Czolgosz shot President William McKinley on August 31, 1901, though President McKinley lived until September 14, 1901.  On September 16, 1901, Czolgosz was indicted.  His trial began September 23rd, he was convicted by the jury on September 24th, the death penalty was recommended on September 26th, and Czolgosz was executed on October 29, 1901.  Thus, Czolgosz's execution occurred a mere 59 days after he shot President McKinley, only 45 days after President McKinley succumbed to his wounds, just 36 days after his trial began and a mere 33 days after he was convicted of the capital crime of assassinating the President.  Likewise, Charles Guiteau, the assassin of President James A. Garfield, was found guilty of the crime on January 25, 1882, and was executed only five months later, on June 30, 1882.[10]  In comparison, a federal defendant today is guaranteed at least 35 days just to REVIEW a pre-sentence report.[11]

In addition to the prejudice the public and the defendant suffer due to the staggeringly slow procedures, this case demonstrates the difficulties imposed on sentencing courts as a result of the sloth-like time line.  Here, a fact was mentioned in AUSA Feller's May 7, 2008, letter and

---

[10]President Abraham Lincoln's and President John F. Kennedy's assassins, of course, were not able to test the efficiency of the judicial system.

[11] *See* Fed.R.Crim.P. 32.(e)(2).  This 35-day period is far in excess of that required in the State of Michigan. *See* M.C.R. 6.425(B) (requiring that the prosecutor and defense attorney be given copies of the presentence report *no less than two days* before the day of sentencing).

referenced at a May 13, 2008, plea colloquy.  As duly noticed by the appellate court, this fact was inaccurately referenced in the July 24, 2008, written sentencing opinion issued *nearly a quarter of a year* later.  The inaccurate reference was not missed only by the Court, however, as: (1) the PSR did not reference this fact; (2) neither party objected to the omission of that fact from the PSR despite 35 days to review the PSR; (3) neither party filed a sentencing memorandum to supplement the record with respect to this fact; and (4) neither party objected to the Court's factual recitation regarding the identity of the money order thief in its proposed opinion.  Thus, the undue delay also caused every participant involved with the sentencing of Defendant to overlook the mistake.  Of course, it is also possible that no one gave much thought to the fact that the written sentencing opinion stated that Defendant stole (and, apparently, was privy to) all of the money orders.  The Court certainly did not, as it was not even a fact considered in fashioning Defendant's sentence.  In fact, upon remand, the Court had to resort to reviewing the parties' appellate briefs to ascertain at which point Malone's involvement was even mentioned on the district court record.  If a federal district court were allowed to pass sentence at a time where the plea hearing remains more than a distant memory, however, the likelihood of such an error would be greatly diminished.

**B.     The July 24, 2008, Written Sentencing Opinion**

As set forth above, when the Court sentenced Defendant on July 24, 2008, the Court announced Defendant's sentence on the record, provided the parties and their counsel with a draft written sentencing opinion containing all of the reasons for the duration of her term of imprisonment (specifically, those factors set forth in 28 U.S.C. § 3553(a)).  At that time, there was no decision issued by U.S. Supreme Court or the Sixth Circuit that prohibited the practice. In fact, even at the time the Sixth Circuit panel issued its opinions and commentary in this case,

20

the practice was not improper.  *See, e.g., United States v. Sain*, 08-2485, 2010 WL 2803936 (6th Cir., July 15, 2010).  In *Sain*, a case decided by a different Sixth Circuit panel only four days before the Sixth Circuit panel rendered its decision in this case, the other Sixth Circuit panel affirmed a sentence imposed by the undersigned utilizing the same process as it did in the instant case.  In other words, in *Sain*, as in this case, the Sixth Circuit panel was aware that this Court heard argument from defense and government counsel and allocution of Defendant, then announced a sentence and gave the parties time to review and object to the "pre-prepared" written sentencing opinion.  Rather than issuing opinions chastising this Court for the practice, however, the *Sain* panel stated:

> **The district court thoroughly explained its conclusion that an above-Guidelines sentence was warranted in Sain's case**. The court's [written] sentencing opinion and order indicated that it considered the § 3553(a) factors and concluded that a within-Guidelines "term of imprisonment would not be sufficient to accomplish the objectives of ... Section 3553(a).

*Sain*, 2010 WL 2803936, at *3.

The Sixth Circuit panel deciding this case, however, in particular the judges who authored and joined the concurring opinion, took umbrage with the Court's preparation of a "pre-prepared" written sentencing opinion that was presented to the parties for their review at the sentencing hearing.  In light of the Sixth Circuit panel's opinion in this case regarding the undersigned's "somewhat disconcerting" practice, it is somewhat ironic and surprising that the *Sain* panel was not troubled by this "indiscretion."  Of course, perhaps the *Sain* panel's failure to comment was not an oversight.  As discussed below, this Court believes that it is likely the *Sain* panel did not find the practice at all "disconcerting" because the undersigned's practice is quite sensible and helpful to the parties and the attorneys.  In fact, contrary to the concern of the Sixth

21

Circuit panel in this case that the undersigned's practice might give "the appearance" that the sentence is a "mere formality," the practice actually provides a defendant with tangible evidence that the Court thoroughly reviewed and considered the relevant and applicable information pertaining to that defendant when determining the defendant's sentence.

Based on well-established law, 28 U.S.C. § 3553(a) requires that a sentencing court consider certain enumerated factors prior to imposing sentence.  In order to carefully and thoroughly consider the entirety of Defendant's substantial relevant background and conduct in light of the § 3553(a) sentencing factors, the Court drafted a comprehensive and substantially complete written sentencing opinion prior to the sentencing hearing.  When drafting that written sentencing opinion, the Court relied on all of the information in the record at that point.  The information reviewed and relied upon by the Court included a detailed PSR, which, in practice, generally represents an integral part of a sentencing judge's understanding of a defendant's background, conduct, and future potential.  *See, e.g.*, *United States v. Labbe*, 588 F.3d 139, 143 (2d Cir. 2009) ("No doubt most sentencing judges have formulated a tentative sentence after reading a [presentence report].");  *see also Wilson*, 614 F.3d at 227 (noting that the presentence report and other materials "typically paint an accurate picture of the defendant and his crime").  Moreover, had either the Government or Defendant submitted a sentencing memorandum prior the July 24, 2008, sentence, the Court also would have reviewed those submissions.

By preparing a draft of the written sentencing opinion prior to the sentencing hearing, the Court was able to: (1) rationally and logically organize its thoughts regarding an appropriate sentence for Defendant, and (2) cogently present those thoughts to the parties at the sentencing hearing.  The Court then listened to and considered both parties' arguments and Defendant's allocution at the sentencing hearing PRIOR to the time the Court announced the sentence, made

changes to and modified the written sentencing opinion, and distributed the written sentencing opinion for review by the Government and Defendant. If the arguments or Defendant's allocution had altered the Court's understanding and/or analysis of the case held by the Court at the outset of the sentencing hearing, the Court would have modified the written sentencing opinion, as necessary, prior to distributing it to the parties at the sentencing hearing.[12]

In this case, the Court heard nothing at the sentencing hearing that caused the Court to alter its factual findings, the analysis it had conducted, or the length of incarceration it was considering prior to the sentencing hearing. After hearing from Defendant's attorney, Defendant and AUSA Gillooly, however, the Court did change, modify and finalize parts of the written sentencing opinion. More specifically, the period of incarceration and the term of supervised release, neither of which had been pre-determined by the Court or put in the written sentencing opinion prior to the sentencing hearing, were added to the written sentencing opinion after hearing from Defendant's attorney, Defendant and AUSA Gillooly (*i.e.*, the additions were made after the sentencing hearing was temporarily adjourned but before the Court distributed the written sentencing opinion to the parties for review). In addition, if, after an opportunity to review the written sentencing opinion distributed by the Court at the sentencing hearing, either party (or both parties) had objected to any of the content in the written sentencing opinion circulated by the Court, and the Court had concluded that such objection(s) had merit (*e.g.*, if either party had indicated that Malone, not Defendant, stole the money orders), the Court would have revised the written sentencing opinion at the conclusion of the hearing, before it signed and

---

[12]In fact, on many occasions, after the Court has heard argument and allocation, the sentence of incarceration the Court has announced on the record has been for a different length of time than the Court had considered appropriate when the sentencing hearing commenced.

filed the opinion.  No such objections were identified by any party when the sentencing hearing resumed, however, so no additional changes were made prior to the time the Court signed and filed the written sentencing opinion.

Both the lead and concurring opinion stress that a sentence should not be decided until after the parties and the offender have spoken at the sentencing hearing.  According to the concurrence, "the sentencing hearing takes on the appearance, if not the reality, of a mere formality" if the sentence has been decided prior to the arguments, advocacy and allocution that occur at a sentencing hearing. *Id.* at 226.  When viewed from the appellate bench, perhaps it is possible to view a sentencing hearing as giving the appearance of "a mere formality;" from the vantage point of a district court judge, however, such a view is not possible.  The reality of each sentencing hearing is that, standing before a district court judge awaiting his or her sentence, there is a living human being.

As the Supreme Court has recognized,

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.

*Koon v. United States*, 518 U.S. 81, 113 (1996).  "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'"*Pepper v. United States*, 562 U.S. at ____, 131 S.Ct. 1229, 1240 (2011) (quoting *Williams v. People of State of N.Y.*, 337 U.S. 241, 247 (1949)).  In other words, contrary to the Federal Sentencing Guidelines, which attempt to classify a criminal defendant and determine an appropriate sentence for him or her pursuant to some sort of mathematical formula or exercise, there are no two defendants who are identical. Each defendant is a human being with a unique set of circumstances, whether it is his or her

upbringing, educational background, length (or absence) of a criminal record, the severity of his or her criminal conduct, etc. Thus, for a district court judge, the sentencing of a criminal defendant is the most difficult, gut-wrenching duty that he or she must perform. As every district court judge knows, his or her decision likely will heavily influence the future of that defendant and, most likely, society as a whole.

When making its decision on the appropriate sentence to impose, the district court judge must consider not only the proper punishment based on the seriousness of the crime and the need to respect the laws of this country, but he or she must also consider whether: (1) the sentence will deter that defendant from recidivism (and others from committing the same crime), (2) the punishment is disparate to that of others convicted of the same conduct, and (3) the public will be protected from future conduct of that defendant. A sentence too high, or too low, will not suffice to meet these goals.

Based on the opinions of the Sixth Circuit panel, in particular the concurring opinion, it is seems as though they are suggesting that: (1) a district court judge should enter the sentencing hearing without any "pre-prepared" material, and (2) the district judge should make a, relatively speaking, instant determination at the sentencing, based only on the arguments and allocution presented at the sentencing hearing, together with his or her recollection of what the PSR said. The undersigned finds that procedure to be woefully inadequate and unworkable, as it would require the sentencing judge to announce a sentence without a thorough consideration of all of the relevant information. Under this method, it would not only be difficult for the sentencing judges to fashion a sentence in accordance with 28 U.S.C. § 3553, it would render the sentencing judge's ability to do so virtually impossible and, more importantly, would be totally and utterly unfair to the defendant.

Alternatively, if the Sixth Circuit is suggesting that the district court judge simply read a defendant's sentence into the record, it puts an unnecessary - and unfair - onus on the parties, particularly where (as in this case) the reasons for the sentence are extensive.  Under that method, counsel for the Government and the defendant, as well as the defendant herself, must endure a lengthy recitation of reasoning by the sentencing judge.  More significantly, all of those participants at the sentencing, including the defendant, will have very little, if any, opportunity to meaningfully comprehend and process the reasons for the sentence before they have to place their objections on the record.

Yet, the Sixth Circuit panel in this case apparently is suggesting that a district court judge deliver his or her sentences in one of those two ways, so as not to give "the appearance" that the sentencing hearing is not a "mere formality"  Ironically, at least to this Court, it seems that conducting sentencing hearings in either of those ways, purportedly for the purpose of not giving "the appearance" that the sentencing hearing is a "mere formality," the sentencing judge would instead be conducting the sentencing hearing in a manner that actually is a "mere formality."

In contrast, preparing a written sentencing opinion in advance of the sentencing hearing ensures that the district court judge has meaningfully considered each of the requisite factors before he or she announces sentence.  More significantly (especially for the sake of "appearance"), preparing and distributing such a written sentencing opinion to the parties for their review at the sentencing hearing visibly demonstrates, both to the defendant and the public, that the Court has thoroughly considered the case before imposing sentence.[13]   The Court

---

[13] For at least the last 50 years, the Eastern District of Michigan has, to varying degrees, used various three-judge councils for purposes of evaluating the appropriate sentence for defendants. The purpose of these three-judge councils has been and continues to be, to: (a) meet, (b) review the PSRs on defendants who were scheduled to be come before those three judges for sentencing, and (c) discuss an appropriate sentence for each individual defendant.  Although the consensus of a three-judge council is not binding on the district court judge who is to sentence a

therefore respectfully but strenuously disagrees with any suggestion that its practice renders irrelevant the sentencing hearing.  As stated previously, if a party (or the parties) present information at the sentencing hearing, and/or if a party or the parties raise objections at the sentencing hearing, that would alter either: (a) the sentence the Court may be inclined to impose, or (b) the Court's analysis in the written sentencing opinion, the written sentencing opinion could, and would, be modified accordingly.[14]   Again, no such evidence or objections were presented in this case.

The concurrence also suggests that a prepared opinion denigrates the "appearance" of fairness at a sentencing hearing because the result might be construed as having been pre-determined.   The Court cannot, however, comprehend how preparing a written sentencing opinion in advance of the sentencing hearing can be disfavored.   As discussed above, when a district court judge prepares a written sentencing opinion in advance of the sentencing hearing, the defendant and the public can know - because they can see the tangible evidence of the words

---

particular defendant, in practice, the vast majority of the time the sentencing judge has imposed a sentence consistent with the consensus sentence reached by the three-judge council.  In light of Sixth Circuit panel's opinions in this case, perhaps that panel also would disapprove of the Eastern District of Michigan's use of the sentencing councils.  Or, perhaps that practice would not be subject to the same scrutiny because it is not visible to the defendant and/or the public and, as such, has no bearing on whether the sentencing hearing has "the appearance, if not the reality, of a mere formality."

[14]In fact, the Second Circuit recently held that a written sentencing opinion filed *prior* to a sentencing hearing was not objectionable in itself where the opinion indicated that the terms were subject to modification at the sentencing hearing.  *See United States v. Labbe*, 588 F.3d 139, 141 (2d Cir. 2009).  As discussed therein, the Second Circuit noted that the sentencing judge's action "shared his tentative view with the parties and usefully focused their attention on matters worthy of dispute by written submission or oral presentation."  *Id*. at 143.  Likewise, the Court's approach at Defendant's sentencing hearing in this case provided the parties an opportunity to review the Court's finding and rationale, as well as voice any objections thereto, prior to the Court finalizing and filing the written sentencing opinion regarding Defendant, rather than merely allowing the parties to preserve their objections for appeal.

on paper - that the sentencing judge has thoroughly considered the requisite factors before announcing the defendant's sentence. This certainly affords a defendant (and the reviewing court) a much greater ability to know that the sentencing judge has carefully considered the unique circumstances of that defendant than at a typical sentencing, when the record consists solely of what the sentencing judge verbally announces in the courtroom. In the latter situation, all or much of which was verbalized may not have been thoughtfully considered prior to the sentencing hearing, and it may even have been decided on the spur of the moment, during the sentencing hearing itself. Under those circumstances, it would be difficult (at best) for a defendant (or a reviewing court) to know that the sentencing judge had carefully considered the unique circumstances of that defendant.

The concurrence further suggests that the sentencing hearing is "a crucial early step in rehabilitation." *Id*. at 227. The Court respectfully disagrees with that suggestion. First, it is not the responsibility or business of a district court to "rehabilitate" those defendants appearing before it. Rather, the responsibility and business of the district court is to ensure the swift and efficient determination of innocence or guilt, and in cases where guilt is proven, to fashion a reasonable, but not greater than necessary, sentence for the crime committed. Second, the factors that district court judges are to consider when pronouncing sentence are enumerated at § 3553(a), and the word "rehabilitation" does not appear in that section. While rehabilitation may be a goal of the Probation Department or the Bureau of Prisons, Congress has not seen fit to bestow that duty on the federal district courts.

The concurrence also makes the following observation:

> There is no minimum or maximum on what the judge must say, no list of magic words or phrases, no easily replicable formula or recipe for a "meaningful sentencing" hearing. Instead, all that is

28

> required is a dialogue that will allow the defendant to walk away
> from the hearing knowing what happened and why - nothing more
> and nothing less.

*Wilson*, 614 F.3d at 227.  This observation is belied both by the concurrence itself and binding

Sixth Circuit precedent.  The concurrence notes that "everyone benefits when the conversation

requires significantly more than 17 pages of transcript." *Id*. at 227-28. Thus, apparently there is

some minimum number of transcript pages that a sentencing judge must meet to avoid criticism,

and that number is greater than seventeen.  In other words, if the undersigned had simply read its

written sentencing opinion into the record from the bench, such action would have: (1) not

created this "appearance" of unfairness, even though the same exact reasons and justifications

for the sentence would have served as the basis for the sentence; and (2) resulted in a transcript

of a more "appropriate" length.

Likewise, binding Sixth Circuit precedent reveals that the concurrence's statement that a

sentencing hearing must contain no magic words cannot be taken seriously by a district judge.

In recent years, seemingly every word uttered at a sentencing hearing that is not in exact

compliance with the stated requirements is grounds for reversal or critique.  *See, e.g.*, *United*

*States v. Howell*, 352 Fed.Appx. 55, 57 (6th Cir. 2009) ("While noting these facts, the district

court gave no indication of the significance or lack of significance attached to each fact.");

*United States v. Recla*, 560 F.3d 539, 547 (6th Cir. 2009) (vacating sentence where "the record

does not disclose the extent to which the possibility of the government filing a Rule 35(b)

motion influenced the district court's sentencing decision - if it influenced it at all."); *United*

*States v. Stephens*, 549 F.3d 459, 467 (6th Cir. 2008) (emphasis in original) ("Unfortunately,

both defense counsel and the district court referred only to *departures*, which leaves us in doubt

as to whether the court fully considered its discretion to vary from the sentencing Guidelines

range."); *United States v. Thomas*, 498 F.3d 336, 340 (6th Cir. 2007) (*citing United States v. Clark*, 469 F.3d 568, 570 (6th Cir. 2007)) (holding that district court's inquiry "Do you have anything else for the record?" failed to satisfy requirement that the court clearly ask for "objections to the sentence that have not been previously raised").   Although the concurrence envisions a "dialogue" at the sentencing, it is nearly impossible for a sentencing judge to engage in such a dialogue when he or she is preoccupied with (1) ensuring that all "magic words" are robotically recited; and (2) carefully crafting each sentence so as to avoid appellate scrutiny.

The concurrence also requires that "the defendant walk away from the hearing knowing what happened and why - nothing more and nothing less."  It is insulting to Defendant to suggest that she could not comprehend what happened at the July 24, 2008, sentencing hearing or why she was sentenced as she was.  Moreover, when the undersigned provided the parties with a draft of the written sentencing opinion at the hearing, Defendant (and all of the relevant actors) actually had a **better** ability to "walk away from the hearing knowing what happened and why" than she (and they) would have had if no written sentencing opinion had been provided to her (and them) for review at the sentencing.

Finally, the concurrence states that "[j]udges are spending increasingly more time behind their desk than on the bench."  *Wilson*, 614 F.3d at 227.  This statement is randomly inserted near the end of the concurrence and appears to come out of the blue, without any context whatsoever.  Moreover, the concurrence offers absolutely no support for this statement in the record.   Incredibly, no studies are cited, no data has been compiled or set forth in the concurrence, and no authority of any kind is identified by the author.  Instead, the concurrence just sets forth the proposition as an irrefutable truth, one that suggests that district court judges are averse to presiding over matters in court. Unfortunately, the undersigned is unable to

ascertain the basis, if any, for this gratuitous conclusion.

It also occurs to the undersigned that the district judges in the Sixth Circuit are actually spending <u>more</u> time in the courtroom because they are required to meet newly created mandates imposed upon them by the Sixth Circuit. Because there is no authority cited for the concurrence's conclusion, the district judges in the Sixth Circuit are again left in limbo with respect to how much time they should be spending in court and how much time they should spend at their desks.

**S/Lawrence P. Zatkoff**
**LAWRENCE P. ZATKOFF**
**UNITED STATES DISTRICT JUDGE**

**Dated:  August 24, 2011**

## CERTIFICATE OF SERVICE

**The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on August 24, 2011.**

**S/Marie E. Verlinde**
**Case Manager**
**(810) 984-3290**

31